Slip Op. 14-129

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

LG ELECTRONICS, INC. ET AL.,

                      **Plaintiffs,**

       **v.**

UNITED STATES INTERNATIONAL TRADE COMMISSION,

                      **Defendant,**

   and

WHIRLPOOL CORPORATION,

                      **Defendant-Intervenor.**

</td><td>

Before: Claire R. Kelly, Judge

Consol. Court No. 13-00100
Public Version

</td></tr>
</table>

## OPINION

[Plaintiffs challenge numerous aspects of the United States International Trade Commission's affirmative determination in the final injury investigation. The court denies Plaintiffs' motion for judgment on the agency record and sustains the International Trade Commission's final affirmative determination of injury to the domestic industry.]

Dated: November 6, 2014

Christopher Allan Dunn, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, and Warren E. Connelly, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for Plaintiffs. With them on the brief were Daniel Lewis Porter, Matthew Paul McCullough, Ross Eric Bidlingmaier, and Claudia Denise Hartleben of Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, Jaehong David Park and Jarrod Mark Goldfeder of Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, Julie Clark Mendoza, Donald Bertrand Cameron, and Rudi Will Planert of Morris, Manning & Martin, LLP, of Washington, DC.

Karl Stuart von Schriltz, Attorney, Office of the General Counsel, U.S. International Trade Commission of Washington, DC, argued for Defendant. With him on the brief were Dominic L. Bianchi, General Counsel, and Neal Joseph Reynolds, Assistant General Counsel for Litigation.

Jack Alan Levy, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Defendant-Intervenor.  With him on the brief were Myles Samuel Getlan, John Doyle Greenwald, James R. Cannon, Jr., Jennifer A. Hillman, Jonathan M. Zielinski, and Thomas Martin Beline.

        Kelly, Judge: Plaintiffs LG Electronics, Inc. and LG Electronics USA, Inc. and

Consolidated Plaintiffs Samsung Electronics Co., Ltd., Samsung Electronics Mexico S.A.

de C.V., Samsung Electronics America, Inc., Electrolux Home Products Corp., N.V., and

Electrolux Home Products, Inc. (collectively, "Plaintiffs") move pursuant to USCIT Rule

56.2 for judgment on the agency record, challenging the United States International Trade

Commission's ("ITC" or "Commission") final affirmative determination in Large Residential

Washers from Korea and Mexico. The Commission's determination was published in the

Federal Register on February 14, 2013.  See Large Residential Washers From Korea and

Mexico, 78 Fed. Reg. 10636 (ITC Feb. 14, 2013) (final determination), ("Final

Determination").  See also Certain Large Residential Washers From Korea and Mexico,

USITC Pub. No. 4378, Inv. Nos. 701-TA-488 and 731-TA-1199–1200 (Feb. 2013),

available at http://www.usitc.gov/publications/701_731/pub4378.pdf.  Plaintiffs claim that

the Commission's final determination is not supported by substantial evidence on the

record and otherwise not in accordance with law.

## Background

        On December 30, 2011, Whirlpool Corporation ("Whirlpool") filed petitions with the

Commission alleging material injury to the domestic industry caused by large residential

washers ("LRWs") from Korea and Mexico.  See Final Determination at 10636; Views of

the Commission (Final) at 3, CD 273 (Feb. 13, 2013), ECF No. 17-4 (June 3, 2013) ("Final

Views").  Following its preliminary investigation, the Commission published its preliminary

determination[1] finding that "there was a reasonable indication that an industry in the

United States is materially injured by reason of" dumped and subsidized LRWs from

Korea and dumped LRWs from Mexico.  Large Residential Washers From Korea and

Mexico, 77 Fed. Reg. 9700 (ITC Feb. 17, 2012) ("Preliminary Determination").   In the

Final Determination, the Commission determined that an industry in the United States

("U.S.") is materially injured by reason of dumped and subsidized LRW imports from

Korea and dumped LRW imports from Mexico.  Final Views at 3.

The Final Views describe LRWs as:

> automatic clothes washing appliances capable of cleansing fabrics using
> water and detergent in conjunction with wash, rinse, and spin cycles
> typically programmed into the unit.  They are produced in either top-load or
> front-load configurations.  Top-load LRWs possess drums that spin on a
> vertical axis and are loaded with soiled clothing through a door on the top
> of the unit.  Front-load LRWs possess drums that spin on a horizontal or
> tilted axis and are loaded with soiled clothing through a door in the front of
> the unit.  All LRWs are typically purchased by households for use in single
> family dwellings.

Id. at 7–8 (footnotes omitted).  The Commission distinguished LRWs from washers more

generally in that LRWs have a capacity of 3.7 cubic feet or greater.  Id. at 10.  The Final

Views explained that washers can be of three types: conventional top-load ("CTL"), high

---

[1] Vice Chairman Irving A. Williamson and Commissioners Shara L. Aranoff, Dean A.
Pinkert, and David S. Johanson voted in the affirmative for the preliminary determination.
Commissioner Daniel R. Pearson voted in the negative for the preliminary determination.
Chairman Deanna Tanner Okun did not participate in these investigations.  See Large
Residential Washers from Korea and Mexico, USITC Pub. No. 4306, Inv. Nos. 701-TA-
488 and 731-TA-1199–1200 (Feb. 2012) ("Preliminary Views"), available at
http://www.usitc.gov/trade_remedy/publications/opinions_index.htm.

efficiency top-load ("HETL"), or high-efficiency front-load ("HEFL").[2]  The domestic like

product was defined to include all three regardless of capacity.  See id. at 12.[3]

    The Commission explained the shifting demand conditions for the various washer

types present in the industry during the investigation.  Even though CTL washers (which

made up the near majority of the domestic like product) had a capacity of less than 3.7

cubic feet and were less energy efficient than LRWs, the Commission found that all

washers are relatively interchangeable and consumers frequently "cross-shopped" all

three product types.  See id. at 29–30 (footnotes omitted).  Although domestic

consumption of CTL washers started out strong in 2009, constituting a large amount of

all washer sales, it declined precipitously from 2009 to 2011.  See id. at 27–28 (footnotes

omitted).  Notably, there were no subject imports of CTLs.  Id. at 44.  Consumption of

both large and small HETLs increased over the relevant period, with much bigger gains

---

[2] CTLs use a pole-shaped agitator, "which cleans clothes by swirling them through detergent and water."  Final Views at 8 (footnote omitted).  These generally have less capacity than LRWs.  HETLs are also top load washers "but qualify as Tier 3 HE [(high efficiency)] machines under CEE [(Consortium for Energy Efficiency)] guidelines because they use less water and energy."  Id. (footnote omitted).  They use an impeller that "lifts and drops clothes into a smaller quantity of water and specially formulated HE detergent." Id. (footnote omitted).  HEFL washers also qualify as Tier 3 HE machines but unlike CTLs and HETLs, they are front-loading.  HEFLs "use less water by lifting clothes with a baffle as the drum spins on a horizontal or tilted axis and dropping them into a smaller quantity of water and HE detergent."  Id. at 9 (footnote omitted).  Similar to HETLs "they reduce energy consumption by spinning clothes at high speeds that extract more water and reduce drying time."  Id. (footnote omitted).

[3] The scope of the investigation changed from the preliminary phase to the final phase. The preliminary phase scope "included all CTL, HETL, and HEFL washers that satisfied the technical specifications of the scope definition."  Final Views at 9 (citing Preliminary Views at 4–6).  However, the amended scope excluded top-loading washers with capacities less than 3.7 cubic feet, thus excluding most CTLs which tend to have smaller capacities.  Id.

in the consumption of small HETLs below 3.7 cubic feet in capacity.  See Final Staff

Report with Additions and Corrections at Tables C-3, C-4, CD 274 (Jan. 10, 2013), ECF

No. 17-5 (June 3, 2013) ("Final Staff Report").   Consumer demand for HEFLs, despite

experiencing a modest increase from 2009 to 2010, declined substantially between 2010

and 2011.  Final Views at 28 (footnote omitted).  The Commission found that the decrease

in consumer demand for HEFLs was due to the decline in sales of smaller HEFL models

between 3.2 and 3.7 cubic feet.  Id. at 29 (footnote omitted).  In general, the Commission

found that increased demand for HETLs came at the direct expense of CTL and HEFL

sales.  Id.

       In the Final Views the Commission analyzed the volume, price effects, and impact

of the subject imports on the broader array of washers that comprise the domestic like

product (all CTLs, HEFLs and HETLs regardless of capacity) and found that the subject

imports had materially injured the domestic industry.   Overall, domestic consumption of

washers decreased very slightly over the period of investigation ("POI").  Id. at 27, 69–70

(footnotes omitted).   The domestic industry nevertheless lost market share to subject

imports from Korea and Mexico.   Id. at 31, 70 (footnotes omitted).   Subject imports

increased in absolute figures, as well as relative to both U.S. shipments and domestic

production.  Id. at 52 (footnotes omitted).  The domestic industry lost substantially more

market share to HETL subject imports than it did to HEFL subject imports.  Id. at 55–56

(footnotes omitted).  As the HETL washer segment gained in importance it took market

share at the expense of both CTL and HEFL sales, and it was also the segment where

the domestic industry lost the most ground to subject imports.  Id. at 29, 54–55 (footnotes

omitted).  Additionally, the Commission found that the domestic industry's cost of goods sold ("COGS") for all washers increased over the POI due to an increase in the cost of raw materials, but that the industry was unable to pass those costs along to the consumer. Id. at 63 (citing Final Staff Report at Table C-6).  Although three domestic producers ceased U.S. manufacturing operations during the POI, domestic capacity increased during this time.  Id. at 68 (footnotes omitted).  However, domestic production and capacity utilization declined over the POI.  Id. at 68–69 (footnotes omitted).

As will be discussed more fully below, the Commission concluded that the shift in consumer demand to HE washers should have enabled the domestic industry to better its financial situation, but instead the industry lost profits on its HETL and HEFL sales.  Id. at 73–74 (footnotes omitted).  The Commission determined that these declines were due to direct subject import competition, which had significant adverse price effects on the domestic like product.  Id. at 73, 75 (footnotes omitted).  Additionally, the Commission found that the decrease in consumer demand for CTL sales was, at least in part, due to low-priced HETL and HEFL subject imports, which also forced domestic producers to lower CTL prices or otherwise prevented CTL price increases.  Id. at 75–76 (footnotes omitted).

Plaintiffs now challenge the Final Determination on several grounds.  Plaintiffs claim the Commission acted contrary to law and without substantial evidence when it defined the domestic industry; conducted a legally and factually deficient investigation; made a decision to discount post-petition data that was unsupported by substantial evidence; made a finding of adverse price effects that was not supported by substantial

evidence; and made a conclusion regarding adverse impact that was both contrary to law and unsupported by substantial evidence.

## Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2012).[4]

## Standard of Review

The court will review a final determination of the Commission and "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. §§ 1516a(b)(1), 1516a(b)(1)(B)(i) (2012).[5] The Commission's determinations must take "into account the entire record, including whatever fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote omitted).

## Discussion

### I.     The Domestic Industry

Plaintiffs challenge the Commission's decision not to exclude Electrolux Home Products, Inc. ("Electrolux")[6] from the domestic industry as both contrary to law and unsupported by substantial evidence.  The statute defines the term "industry" to include "the producers as a whole of a domestic like product, or those producers whose collective

---

[4] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[6] The Commission found that "Electrolux qualifies as a related party because it imported subject merchandise from Mexico during the period of investigation and is related to a subject foreign producer in Mexico, Electrolux Home Products Corp., N.V."  Final Views at 18 (footnote omitted).

output of a domestic like product constitutes a major proportion of the total domestic production of the product."   19 U.S.C. § 1677(4)(A).   Further, the statute gives the Commission discretion to exclude producers of the domestic like product when that producer is related to an exporter or importer of the subject merchandise.   See id. § 1677(4)(B)(i).   Under the statute, "[i]f a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry."   Id.

The words "may, in appropriate circumstances, be excluded from the industry" leave it to the Commission to establish a reasonable standard for the exclusion of a domestic producer.   Here, the Commission has adopted a reasonable standard.   The Commission explained that

> [t]he primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include the following: (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation, i.e., whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market, and (3) the position of the related producer vis-a-vis the rest of the industry, i.e., whether inclusion or exclusion of the related party will skew the data for the rest of the industry.

Final Views at 17 n.67 (citation omitted).   The Commission's test clearly falls within the range of permissible alternatives given to the agency by Congress.[7]   Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984).

---

[7] Plaintiffs argue that the object and purpose of the statute support

(footnote continued)

Plaintiffs argue that the Commission's standard is too narrow given the statutory language.  This argument fails for two reasons.  First, as long as the agency constructs a reasonable interpretation of ambiguous statutory language, this court must accept that interpretation.   Chevron, 467 U.S. at 844.  The fact that the test as articulated by the Commission is geared towards situations where a related domestic producer's performance masks injury does not make the standard unreasonable.  Although nothing in the statute mandates that the Commission consider whether the domestic firm benefits from its relationship with an exporter or producer, nothing precludes it either.  The phrase "in appropriate circumstances" is ambiguous and is a textbook example of an implicit delegation to the agency under Chevron.

Second, Plaintiffs mischaracterize the standard applied by the Commission here as improperly focusing on whether Electrolux received a benefit or was shielded from import competition.  Plaintiffs submit that the Commission's three-factor test is actually about whether the domestic industry data is skewed by exclusion or inclusion of the

_____

a broader reading of "appropriate circumstances" than the one given by the Commission. Joint Br. Pls. Supp. J. Agency R. 9, Nov. 26, 2013, ECF No. 59 ("Joint Br. Pls."). Plaintiffs contend that when a domestic producer is related to and imports subject merchandise from an exporter, "there is the potential for the data submitted by those parties to reflect factors unrelated to import competition.  This may serve to distort the data so as to affect the ITC's analysis of both injury and causation significantly."  Id. at 11–12.   While the Plaintiffs might prefer a broader reading of the statute, Congress has given the Commission the power to determine when a potential distortion constitutes "appropriate circumstances" to exclude a related party.  The Commission has articulated a reasonable test for determining whether there are appropriate circumstances in this case to exclude Electrolux. The test passes muster whether one considers it a question of statutory interpretation under Chevron or under an abuse of discretion standard.  See, e.g., Rust v. Sullivan, 500 U.S. 173, 184 (1991) (citing Chevron, 467 U.S. at 842–43) (stating that the agency's construction of the statute will not be disturbed as an abuse of discretion if it is reasonable).

related party.  Joint Br. Pls. 12.  Plaintiffs further argue the concept of distortion is broader

than an inquiry into whether a related party benefits from its relationship with the foreign

producer.  However, the Commission's test is not a one-factor test about whether there

was a benefit to the related party.  The test also considers the related party's percentage

of domestic production and whether exclusion or inclusion would skew the data for the

rest of the industry.  Final Views at 17 n.67 (citation omitted).  The three factors allow the

Commission to determine whether there are appropriate circumstances in any given case.

For example, the size of the producer may matter to the agency in determining whether

excluding it would distort the data regardless of any benefit it received.  The court finds

that the test employed by the Commission is a reasonable one that looked not only at the

benefits received by the domestic producer, but also at its share of the market and

whether excluding the producer would distort the data.[8]

Plaintiffs alternatively argue that the Commission's decision not to exclude

Electrolux from the domestic industry was not supported by substantial evidence.  The

Commission analyzed evidence under all three factors discussed above.  First, the

Commission discussed Electrolux's domestic production stating that it was the third

largest domestic producer of the domestic like product and the second largest domestic

producer of LRWs at the beginning of the POI in 2009.  After acknowledging that

---

[8] The Commission also discussed Electrolux's ratio of imports to U.S. production, explaining that the increasing ratio of imports combined with increased operating losses was evidence that Electrolux did not receive a benefit from subject imports.  Final Views at 19–20 (footnotes omitted).  It also considered Electrolux's apparent lack of a current interest in imports but explained that it was "an insufficient basis by itself to warrant its exclusion as a related party in these investigations."  Id. at 19.

Electrolux made the decision to move production of all washers to Mexico prior to the POI, the Commission also noted that Electrolux's ratio of subject imports to domestically produced washers increased in each year of the POI until it produced no washers in the U.S.  Final Views at 19 (footnote omitted).  However, the Commission discounted the fact that Electrolux's then-current interests were not aligned with those of the domestic industry in light of the fact that there was "no evidence that Electrolux's domestic production activities benefitted from its subject imports or were otherwise shielded from subject import competition . . . ."  Id. (footnotes omitted).  Supporting this finding, the Commission explained that Electrolux's operating losses as a share of net sales and its losses on domestic LRW production increased at the same time as its ratio of subject imports to domestic production increased.  Id. at 19, 20 & n.78 (citations omitted).  Further, the Commission explained that Electrolux did not claim its domestically produced LRWs were shielded from competition with subject imports, and the record shows "there was a significant volume of subject imports of LRWs similar to those produced domestically by Electrolux."  Id. at 20 (footnote omitted).  Finally, the Commission found that excluding Electrolux would distort the data because it would mask declines in domestic capacity and employment during the POI.[9]  Id.

---

[9] The court notes that affecting data is not the same as distorting data.  Removing any number of workers or any industry capacity from the data would affect the overall dataset. A distortion would occur where a producer who competed with imports in the same manner as other domestic producers was removed or a producer who had been shielded from imports was included.  Here, the Commission found that removing Electrolux would distort the data.  See Final Views at 20–21.  Commissioner Aranoff more specifically found that "to exclude Electrolux from the domestic industry would skew the Commission's data, particularly for the early part of the period of investigation when Electrolux's primary interest was in domestic production."  Id. at 20 n.80.

The Commission reasonably addressed Plaintiffs' arguments regarding evidence that might detract from its findings.  Plaintiffs argue the Commission ignored evidence that Electrolux moved its production from the U.S. to Mexico for reasons other than imports.  Plaintiffs contend this evidence suggests Electrolux's domestic operations were shielded from import competition. Joint Br. Pls. 17.  Plaintiffs point to "certified statements by Electrolux that it was <u>not</u> experiencing a decline in sales caused by customers purchasing imported articles rather the [sic] articles produced domestically by Electrolux." <u>Id.</u> (citing Electrolux Posthearing Brief and Responses to Commissioner and Staff Questions Resp. at 1–5, Ex. 1 at 6, CD 233 (Dec. 18, 2012), ECF No. 111-8 (July 1, 2014)).  Plaintiffs argue that these assertions go unaddressed and that the Commission had an obligation to substantiate the existence of import competition in response.  In fact, the Commission explicitly acknowledged Plaintiffs' arguments regarding the motivation for Electrolux's move, and addressed the issue of competition by finding that a substantial number of subject imports were similar to Electrolux's domestic washers.[10]  Plaintiffs claim the Commission lacked record support for its statement that there was a significant volume of subject imports of LRWs similar to those produced domestically.[11]  However,

---

[10] Further, Plaintiffs' assertion that Electrolux did not move its production because of imports does not address the Commission's inquiry at this stage of the investigation.  The question under the Commission's analysis here is whether the related party was shielded from imports such that its inclusion would distort the data, not whether subject imports caused the harm.  The causation of harm is a separate question that arises after the Commission has identified the domestic industry.  <u>See</u> <u>infra</u> section V.

[11] Plaintiffs focus on an error in the Commission's footnote to this statement that describes Electrolux's domestic HEFL washers as having a capacity of 3.2 cubic feet rather than their actual capacity of 3.0 cubic feet.  <u>See</u> Final Views at 20 n.82 (citations omitted). Even if the Commission incorrectly stated the size of

(footnote continued)

the record is replete with evidence and Commission explanations about competition and cross-shopping across washer types and capacities.  See, e.g., Final Views at 11–16 (defining the domestic like product more broadly than LRWs to include washers with smaller capacities based, in part, on findings of interchangeability).  Plaintiffs' arguments fail as they largely ignore the majority of the record evidence relied upon by the Commission to draw the reasonable conclusion that the circumstances were not appropriate to exclude Electrolux.  See id. at 18–21 (citing Final Staff Report at Tables III-1, III-2, III-11, IV-3, IV-4, V-8, V-11, VI-2, C-6; Electrolux's Domestic Producer's Questionnaire Response at II-9, V-1, CD 114 (Oct. 18, 2012), ECF No. 119 (Sept. 23, 2014); Hearing Transcript (Revised and Corrected Copy) at 224, PD 216 (Dec. 11, 2012), ECF No. 112-4 (July 1, 2014) ("Hearing Transcript"); Electrolux's Prehearing Brief at 17, CD 205 (Dec. 4, 2012), ECF No. 111-5 (July 1, 2014)).  Thus, the Commission's decision not to exclude Electrolux from the domestic industry was supported by substantial evidence and in accordance with law.

## II.   The Investigation

Plaintiffs argue that the Commission acted arbitrarily by failing to collect certain pricing data and Whirlpool's business plan supporting its decision to relocate certain production to the U.S.  The court disagrees.  When making a final determination under

---

the domestically produced HEFLs, it does not matter to the court's analysis of whether the Commission's decision was supported by substantial evidence.  All HEFLs, regardless of size, were included in the like product and the Commission found there was cross-shopping amongst all washers.  The court has "no 'substantial doubt' that the agency would have drawn the same ultimate inference had" it not made that mistake. Campbell v. Merit Sys. Prot. Bd., 27 F.3d 1560, 1570 (Fed. Cir. 1994).

19 U.S.C. § 1671d(b) or § 1673d(b), the Commission must determine whether 1) a domestic industry, 2) is materially injured, 3) by reason of the dumped or subsidized imports for which Commerce has made an affirmative determination.[12]   In making this determination, the Commission is required to consider

> (I) the volume of imports of the subject merchandise,[13]
> (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
> (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States . . . .[14]

---

[12] For purposes of the antidumping provision, which is substantively the same as the language in the countervailing provision, the statute reads

> (b) Final determination by Commission
>   (1) In general
>   The Commission shall make a final determination of whether--
>   (A) an industry in the United States--
>     (i) is materially injured, or
>     (ii) is threatened with material injury, or
>   (B) the establishment of an industry in the United States is materially retarded,
>
>   by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1) of this section. If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated.

19 U.S.C. § 1673d(b)(1).

[13] For purposes of "evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

[14] When the Commission evaluates the impact of the subject imports on the domestic producers as provided for in 19 U.S.C. § 1677(7)(B)(i)(III), it

> shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—
>   (I)     actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>   (II)    factors affecting domestic prices,

(footnote continued)

19 U.S.C. § 1677(7)(B)(i).   Additionally, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  Id. § 1677(7)(B)(ii).

There is no statutorily designated minimum standard that requires a particular degree of thoroughness in the Commission's investigation.  The Commission must collect the information that allows it to fulfill its statutory obligations.  See id. §§ 1677(7)(C)(i), (ii), (iii).  For example, the statute requires an inquiry into underselling, price depression and price suppression:

> [T]he Commission shall consider whether--
> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

Id. § 1677(7)(C)(ii).  Therefore, the Commission collects data necessary to conduct its analysis in light of the statute.   Here, it collected quarterly pricing data to analyze underselling under 19 U.S.C. § 1677(7)(C)(ii)(I).   It compared the quarterly prices of subject imports to quarterly prices of LRWs based on detailed product definitions.  It also

---

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.
    The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.
19 U.S.C. § 1677(7)(C)(iii).

collected data to make a determination of price depression and price suppression under

19 U.S.C. § 1677(7)(C)(ii)(II).  For price suppression and depression, it collected a variety

of data on the entire market for all washers as the inquiry focused on the effect that the

subject imports had on domestic like product prices.  See Final Views at 64.   Therefore,

it collected data to determine the ratio of the COGS-to-net sales for the domestic like

product.  See id.  Given the statutory instruction on the analysis to be performed, the

Commission acted reasonably.

The Commission collected sufficient data to support its underselling

determinations.  It received pricing data from "[t]wo domestic producers and five importers

of subject merchandise from Korea and Mexico . . . ."  Id. at 58 (footnote omitted).  There

was "usable quarterly net U.S. f.o.b. selling price data for 11 LRW products, although not

all firms reported pricing for all products for all quarters."  Id. (footnote omitted).  This data

"accounted for approximately [[     ]] percent of U.S. producers' U.S. shipments of

washers . . . ."[15]  Id. (footnote omitted).  The data included quarterly pricing data for all

LRW models.  See id.; Final Staff Report at V-19.

For the Commission's price suppression and price depression analysis, it

requested and received trade and financial data for all washers, including CTL and HETL

models less than 3.7 cubic feet in capacity on an industry wide basis for the years during

the POI.  Def.'s Opp'n Pls.' Mot. J. Agency R. 29, Apr. 28, 2014, ECF No. 89 ("Def.'s

Opp'n") (citing Final Staff Report at Tables C-4, C-5, C-9).  See, e.g., Whirlpool's

---

[15] The percentage of U.S. shipments for which data was submitted as that percentage is
stated in the Final Views, is a percentage of all washer sales, not just LRW sales.

Response to U.S. Producer Questionnaire at II-11, CD 113 (Oct. 17, 2012), ECF No. 114 (July 29, 2014).   The Commission obtained testimony from Whirlpool's Chairman and from "an official from Home Depot," to the effect that discounting the larger HETL and HEFL subject imports had a price compressing effect on all washers.   Def.'s Opp'n 30 (citing Final Views at 44, 45 & n.216).   The Commission collected data concerning the ratio of COGS-to-net sales for CTL washers.   See Final Views at 76 n.333 (citing Final Staff Report at Table C-4).   It found that COGS-to-net sales increased over the POI, supporting its finding of price suppression and depression.   See id.   For further support, during the Commission Hearing on December 11, 2012, the Commission asked Whirlpool to provide it with pricing information for HETL washers with a capacity under 3.7 cubic feet.   See Hearing Transcript at 189; Whirlpool's Post-Hearing Brief at III-1, III-2, Ex. 24, CD 235 (Dec. 18, 2012), ECF No. 111-10 (July 1, 2014).   Whirlpool's response includes pricing data for two top-loading models, CEE Tier 2 or 3, with DOE rated capacity of 3.4–3.6.   The information includes the number of units for each quarter, the corresponding invoice amount, and a net average unit value ("AUV").   Whirlpool's Post-Hearing Brief at Ex. 24.   As will be discussed more fully below, this data is sufficient evidence to support the Commission's conclusion as to both price suppression and depression, as well as the finding of adverse impact.   The information that the Commission chose to collect in light of the circumstances was reasonable.

Nonetheless, Plaintiffs claim the Commission's findings were premised on insufficient data.   Joint Br. Pls. 21.   Plaintiffs argue that the Commission should have requested quarterly domestic pricing data for CTL and HETL models under 3.7 cubic feet

in capacity, and that without this information it could not have concluded that the larger HETL and HEFL subject imports had adverse price effects on the smaller CTL models. Id. at 26. Plaintiffs contend this finding was a significant factor in the Commission's overall impact analysis under § 1677(7)(C)(iii). Plaintiffs claim must be rejected for three reasons.

First, the Commission reasonably used the quarterly pricing data it did collect to find specific instances of subject import underselling. See Final Views at 60 n.268. It used quarterly data to compare prices for specifically defined LRW models. See id. Plaintiffs would have preferred that the Commission collect quarterly price data on all washers even if there were no imports for comparison. The court can understand why the Plaintiffs would have liked to have this information. Such quarterly data for CTL models might provide the Plaintiffs with "argumentation to refute the ITC's conclusion that subject imports had an adverse impact on domestic producers of CTL units." Joint Br. Pls. 26. However, the Commission's purpose in collecting quarterly price data was to make "apples-to-apples price comparisons based on specifically defined LRW models." Final Views at 60 n.268 (citing Final Staff Report at V-19). It made such comparisons to fulfill its obligation under the statute to "consider whether (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products," 19 U.S.C. § 1677(7)(C)(ii)(I), and it was therefore reasonable for it to have only collected data for the specific models for which there were imports to compare.

Second, Plaintiffs conflate the Commission's inquiry under 19 U.S.C. § 1677(7)(C)(ii)(I) with 19 U.S.C. § 1677(7)(C)(ii)(II). While the Commission collected

quarterly pricing data for the former (in order to make an apples-to-apples comparison), it collected and relied upon different data for the latter.  For price suppression and price depression, it relied upon COGS data in combination with demand and price trends.  Final Views at 61 n.272, 63 & n.277 (citations omitted).  It found a cost price squeeze among domestically produced HETL washers with a capacity of 3.7 cubic feet or greater.  Id. at 64.  Likewise, it relied upon COGS-to-net sales data and correspondence evidence to find price suppression in the HEFL market.  See id. at 64–65.

Third, with respect to the impact of the subject imports on CTLs (for which there were no subject imports) the Commission did not rely upon quarterly pricing data to make its findings.  Instead, the Commission found that "lower prices on larger, more fully featured washers, such as HETL and HEFL washers, adversely affect the sales volumes and prices of smaller, less fully featured washers, such as CTL washers." Id. at 75 (citing Final Views at section V.D.).  The evidence relied upon included comments from all parties that Whirlpool's 3.6 cubic foot capacity HETL washer competed with the larger subject imports,[16] market studies demonstrating that consumers cross-shop CTL, HETL

---

[16] Plaintiffs argue that without any quarterly pricing data for domestically produced small HETLs, they were prevented from arguing that these models were responsible for causing declining CTL sales.  Joint Br. Pls. 28.  However, the Commission found that small HETLs were not shielded from subject import competition. See Final Views at 44.  Thus, smaller domestic HETLs were subjected to the same market pressures by virtue of the subject imports as CTLs, HEFLs and larger HETLs.  The Commission further addressed this argument in its impact analysis.  Id.at 76 n.332 (citations omitted); infra Section V. Moreover, the Commission found that the increase in U.S. shipments of HETL washers did not offset the rising volume of HETL subject imports.  Final Views at 55 n.251.  The Commission noted the domestic industry lost HETL market share to subject imports, and that imports depressed and suppressed U.S. prices throughout the entire washers market.  Id.

and HEFL washers,[17] from Whirlpool's Chairman and CEO as well as from Home Depot

that low prices for premium LRWs compressed washer prices for all models down the

line, and the increasing COGS-to-net sales ratio for CTLs.  Final Views at 13 n.47, 44, 45

& n.216, 75 n.331, 76 n.333.  See also Def.'s Opp'n 30 (citations omitted).   Thus, the

Commission did not need to collect quarterly price data on smaller CTLs and HETLs in

order to support its findings.

Plaintiffs also argue that the Commission should have collected data on non-

subject imports from Germany and China.  Plaintiffs acknowledge that the Commission

"does not normally collect quarterly price and volume data on non-subject imports," but

argue that "the circumstances in this case compelled it to do so."  Joint Br. Pls. 29.

Plaintiffs argue that any harm accruing to the domestic HEFL industry could have been

caused by non-subject HEFL imports from Whirlpool's related party supplier in Germany.

Id.  Plaintiffs theorize that because Whirlpool imported a significant volume of HEFL units

from Mexico and Germany, that the Commission was obligated to investigate whether

Whirlpool's pricing-practices for its German-origin HEFL units mirrored those of its subject

imports from Mexico, which undersold the comparable domestic like product.  Id. at 29–

31.  Plaintiffs assert that "it is possible, if not highly likely, that had it investigated this

issue, the ITC would have found that Whirlpool, the largest domestic producer, by far,

had caused injury to the other members of the domestic industry through the prices that

---

[17] Indeed, Plaintiffs themselves argued that CTLs should be included in the domestic like
product because consumers cross-shop CTL, HETL and HEFL washers.  See Final Views
at 10 (footnotes omitted) (stating that Respondents argued for expansion of the domestic
like product definition on grounds including interchangeability of smaller washers with the
larger subject import LRWs).

it charged for its German-origin units." Id. at 29.   Plaintiffs argue the failure to collect this

information requires a remand because it was a "potentially significant cause of [ ] injury

that the domestic industry suffered." Id.  Plaintiffs seek to construct an alternative theory

of harm and wish to have the Commission collect information to support that theory.

The Commission collected the requisite data it needed to consider the price effects

of the subject imports on the domestic like product.  19 U.S.C. § 1677(7)(B)(i)(II).  It is not

required to collect pricing data on non-subject imports.  Although it must consider potential

alternate causes of harm in its impact analysis, Mittal Steel Point Limited v. United States,

542 F.3d 867, 878 (Fed. Cir. 2008), here it did so.   The Commission specifically

considered whether non-subject imports were an alternate cause of harm to the industry

and found that they had a declining presence in the U.S. market during the POI.  See

Final Views at 77–78 (footnote omitted).

Finally, Plaintiffs claim the Commission should have obtained Whirlpool's business

plans to relocate production from Germany and Mexico to the U.S. in order to rule out

other superseding causes of injury.  Plaintiffs argue that as the "cornerstone of Whirlpool's

material injury claim was its assertion that the unfairly low prices" of subject imports

"undermined . . . its $100 million investment in HEFL production in the United States," the

Commission should have obtained a copy of Whirlpool's business plan.  Joint Br. Pls. 31,

33.  Plaintiffs argue that as a result of the Commission's failure to obtain this information,

the Commission's findings lack evidentiary support.  Id. at 33.   However, as Plaintiffs

acknowledge, the Commission did request that Whirlpool provide information and

analysis in support of its investment assumptions.  In Whirlpool's Post-Hearing Brief,

Whirlpool provided its anticipated operating profit rate and explained that "(a) demand for large capacity HEFL washers would 'remain strong;' (b) the Ohio plant would have a 'competitive cost structure;' and (c) prevailing market prices 'would remain at economic levels.'" Id. at 34 (citing Whirlpool's Post-Hearing Brief at II-62).  Although Plaintiffs might have appreciated the additional information regarding Whirlpool's economic assumptions and projections, the Commission's reliance on the above information was reasonable.

Plaintiffs speculate that Whirlpool's decision to relocate its HEFL production was unsound, and that its poor economic judgment is to blame for its own inability to realize its projected profit.  See id. at 33.  Plaintiffs attempt to break the causal link by blaming Whirlpool for its own poor performance.  Plaintiffs believe Whirlpool's business plan was necessary to sufficiently explain and substantiate its business assumptions, and that the other record evidence cited by the Commission in the Final Views was not responsive to Plaintiffs' causation concerns.  Id. at 33–34.  However, the Commission reasonably relied on the testimony of Whirlpool's Chairman and CEO, as well as Whirlpool's questionnaire responses in determining that Whirlpool's business projections were not to blame for its operating losses.  Final Views at 74 n.328 (citations omitted).  Additionally, other record evidence supports the Commission's finding that subject imports were responsible for the price suppressing effects on the lowered introductory price of Whirlpool's HEFL domestic models in 2010.[18]  The Commission examined the inability of the domestic industry to

---

[18] The evidence includes [[



]].  Def.'s Opp'n 35

(footnote continued)

raise prices during the POI. The Commission pointed to the increased consumer demand

for large HEFLs over a three year period,[19] and found that operating losses could not

have been caused by demand trends.  Id. at 65 (footnote omitted).   Therefore, the

Commission thoroughly addressed Plaintiffs' concerns regarding Whirlpool's business

assumptions, and relied on a substantial volume of information to confirm the causal link

between the subject imports and the poor performance of the domestic industry's HEFL

sales.

## III.    Post-Petition Data

Plaintiffs challenge the Commission's decision to discount the weight of post-

petition data.  Under 19 U.S.C. § 1677(7)(I), the Commission may consider

> whether any change in the volume, price effects, or impact of imports of the
> subject merchandise since the filing of the petition . . . is related to the
> pendency of the investigation and, if so, the Commission may reduce the
> weight accorded to the data for the period after the filing of the petition in
> making its determination of material injury . . . .

19 U.S.C. § 1677(7)(I).  The court finds that the Commission's determination to discount

the value of post-petition data because changes in the data were related to the filing of

the petition was supported by substantial evidence.

The language of the statute grants broad discretion to the Commission to consider

whether "any change" is "related to the pendency of the investigation."  Id.  According to

the Statement of Administrative Action ("SAA"), the grant of this discretion is in recognition

---

(citing Whirlpool's Prehearing Brief at 59–60, Attachs. 2, 4-B, 4-C, CD 203 (Dec. 4, 2012),
ECF No. 111-5 (July 1, 2014)).  In support, Defendant points to evidence showing the
domestic industry's increasing COGS-to-net sales ratio for its HEFL models and
increasing operating losses.  Final Staff Report at Table C-2.
[19] Market demand for large HEFLs [[                                    ]].  Final Views at 65.

that the filing of the petition "can create an artificially low demand for subject imports, thereby distorting post-petition data compiled by the Commission."   Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 854 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4186 ("SAA").  The SAA also makes clear that the Commission has the discretion to presume a change in data was related to the filing of the petition under certain circumstances.  SAA at 854.

In the Final Determination, the Commission relied "principally on data from 2009 to 2011 because" it found that "the interim 2012 data were affected by the filing of the petition."  Final Views at 51 (footnote omitted).  Specifically, the Commission found that the petition "contributed significantly" to the domestic industry's improved performance:

> [T]he filing of the petition contributed to Whirlpool's realization of a price increase across its washer line in January 2012.  The fact that LG, Samsung, and Whirlpool announced price increases prior to the petition's filing does not alter our analysis because the benefit of the increases only accrued to the domestic industry upon the realization of the price increases in January 2012, after the petition's filing.  In addition, the volume of subject imports from Korea was significantly lower in January-June 2012 relative to January-June 2011.

Id. at 51 n.240 (citing Hearing Transcript at 41).  The Commission reasonably found that interim 2012 data was affected by the filing of the petition based upon substantial record evidence.  It found that the filing of the petition contributed to "Whirlpool's realization of a price increase across its washer line in January 2012."  Id. (citation omitted).  The Commission relied upon the decline in cumulated subject import shipments during January–June 2012 as compared with January–June 2011.  See id.  The Commission noted the significant decrease in the volume of imports from Korea in January–June of

2011 relative to January–June of 2011.  Based on the evidence cited, the Commission

reasonably decided to discount the value of post-petition data.

Nonetheless, Plaintiffs make several arguments that they claim undermine the

reasonableness of the Commission's determination.  The Commission reasonably

addressed all of these arguments.  First, Plaintiffs argue that Whirlpool's price increase

does not support the Commission's finding because Whirlpool had planned and

announced the price increase prior to the filing of the petition.   The Commission

recognized and considered this argument.  It explained that "[t]he fact that LG, Samsung,

and Whirlpool announced price increases prior to the petition's filing does not alter our

analysis because the benefit of the increases only accrued to the domestic industry upon

the realization of the price increases in January 2012, after the petition's filing."  Id.  In

support of its analysis, it reasonably noted Whirlpool's Vice President of Sales' statement

that he was certain the company's ability to realize the announced price increase was

due to the filing of the petition.  See id. (citing Hearing Transcript at 41).

Plaintiffs further argue that the Commission did not properly consider a statement

from Whirlpool's president regarding the benefit to Whirlpool's performance from the filing

of the petition.  The Commission explicitly considered this statement and explained it:

> We recognize that a Whirlpool official described the benefit of the petition
> as "zero" during a conference call with investors. However, the official was
> addressing the benefit of both the Washers and Bottom Mount Refrigerator
> petitions in the third quarter of 2012, which is outside the post-petition
> January-June 2012 period relevant to our analysis here. Moreover, the
> Commission issued negative determinations in the Bottom Mount
> Refrigerator investigations in May 2012. The Whirlpool official may also
> have been referring to Whirlpool's second attempted price increase on
> washers effective July 2012, which failed. Thus, the conference call does

not undermine our conclusion that the filing of the petition benefitted the domestic industry's performance during the January-June 2012 period.

Id. (citing LG's Post-Hearing Brief at 13, CD 236 (Dec. 18, 2012), ECF No. 114-2 (July 29, 2014); Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico, USITC Pub. 4318, Inv. Nos. 701-TA-477 and 731-TA-1180–1181 (May 2012), available at 2012 WL 2364527; Hearing Transcript at 350).

Plaintiffs argue that the decline in imports upon which the Commission relied was not supported by anything more than a temporal association between the two events and was not significant because it was part of a trend.  Joint Br. Pls. 38; Joint Reply Br. Pls. Supp. J. 23, June 6, 2014, ECF No. 99 ("Pls.' Reply").  However, as Plaintiffs acknowledge, the SAA provides that

> when the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation. In the absence of sufficient evidence rebutting that presumption and establishing that such change is related to factors other than the pendency of the investigation, the Commission may reduce the weight to be accorded to the affected data.

SAA at 854.  Here, the Commission found there was a "significant change in data concerning the imports or their effects" as envisioned by the SAA.  Id.  Specifically, it found a significant drop in imports of the subject merchandise from Korea in January-June of 2012, and as a result "cumulated subject import U.S. shipments were [[    ]] percent lower in January-June 2012 than in January-June 2011."  Final Views at 51 n.240. The argument that the decline in imports was part of a larger trend invites the court to re-weigh the Commission's determination.  The court will not do this.

Plaintiffs also argue that the Commission improperly ignored post-petition data for some analyses but included it for others:

> While the ITC refused to accept the 2012 data to the extent that it might lead to the conclusion that subject imports had no significant adverse effect on the condition of the domestic industry, it did rely on 2012 data for a limited showing that *in one product category*, imports increased in 2012. The ITC found that in the category of HETL washers, imports increased their market share in 2012. The ITC ignored the fact that in top load washers as a whole, the share of the market held by subject imports declined in 2012.

Joint Br. Pls. 38–39 (citing Final Views at 55 nn.250–51; Final Staff Report at Table C-9).

See also Final Staff Report at Table C-3.  The Plaintiffs argue that the Commission "chose to ignore the overall top load washer market data, which showed a decline in import market share . . . ."  Joint Br. Pls. 39.  The statute gives the Commission that discretion as it states that the Commission "may reduce the weight accorded to the data . . . ."  19 U.S.C. § 1677(7)(I).  In this case, the Commission noted that one particular domestic producer entered the [[                                                                   ]], and that the producer in question alleged [[

     ]].  See Final Views at 51 n.240, 55 n.251 (internal citations omitted).  In order to evaluate the allegations of harm to the domestic producer that had entered the market during this time, it was reasonable for the Commission to consider the volume of subject imports in the HETL category during the January–June 2012 period.

Finally, Plaintiffs contend that the Commission did not accord less weight to post petition data, but that "it *excluded* that information from its consideration of volume impact."  Pls.' Reply 21.  Plaintiffs argue that had the Commission given any consideration to the data it would not have reached the conclusion that it did.  Id.  To argue that the

Commission could not have weighed the evidence because had it done so it would have reached a different conclusion is simply an invitation to the court once again to reweigh the evidence for the Commission.  The court will not do this.  The Commission reasonably exercised the discretion afforded to it by Congress to discount the value of post-petition data.

## IV.  <u>Adverse Price Effects</u>

Plaintiffs argue that the Commission' finding of adverse price effects is not supported by substantial evidence.   Plaintiffs characterize the Commission's determination as being premised significantly on a deficient lost sales analysis.  The court finds that the Commission based its adverse price effects analysis upon specific findings of underselling, price depression, and price suppression.  These findings, as well as its findings regarding lost sales, were supported by substantial evidence.

In evaluating the subject imports' effects on the prices of domestically produced products under 19 U.S.C. § 1677(7)(B), the Commission considers (1) whether there has been significant price underselling by the subject imports, and (2) whether the effect of the subject imports significantly depresses domestic prices or significantly prevents price increases which otherwise would have occurred. 19 U.S.C. § 1677(7)(C)(ii).   In prior investigations, the Commission has considered lost sales and revenue as an indication that subject imports negatively impacted prices for the domestic like product.  <u>See, e.g.</u>, <u>Maine Potato Council v. United States</u>, 9 CIT 293, 302, 613 F.Supp. 1237, 1245–46 (1985); <u>Copperweld Corp. v. United States</u>, 12 CIT 148, 169–70, 682 F.Supp. 552, 572 (1988).

Here, the Commission found underselling, price depression, and price suppression.  The Commission found that between 2009 and 2011 "subject imports undersold domestically produced LRWs" consistently.  Final Views at 60 & n.269 (citing Final Staff Report at Tables V-6 to 16, V-18).[20]  The Commission also found that the underselling depressed domestic like product prices significantly.  Id. at 61.  In making this finding, the Commission noted that domestic industry prices for six pricing products, representing [[      ]] of the reported sales, declined over the period of investigation.  See id. at 61–62 (citing Final Staff Report at Tables V-6 to 16).  The Commission "also f[ou]nd it significant that domestic producer sales prices declined with respect to all HETL washers for which data were collected," including those below 3.7 cubic feet in capacity, despite an increase in U.S. consumption of HETL washers.  Id. at 62 (citing Final Staff Report at Table C-9).[21]

In addition, the Commission found that underselling caused price suppression.  In particular, the Commission found that the pervasive amount of underselling prevented the domestic industry from raising prices to cover the increased costs of raw materials.  Id. at 63 (citing Final Staff Report at Table V-1, V-2; Figure V-1; Table C-6).  The Commission also found evidence of price suppression in the LRW market based on its analysis of the domestic industry's increasing COGS-to-net sales ratio.  Despite increasing consumer

---

[20] Specifically the Commission found underselling "in [[   ]] of [[   ]] quarterly comparisons, or [[      ]] percent of the time, at margins ranging from [[    ]] to [[      ]] percent and averaging [[      ]] percent." Final Views at 60 n.269 (citing Final Staff Report at Tables V-6 to 16, V-18).
[21] U.S. consumption of HETL washers increased by [[         ]] during this period.  Final Views at 62 (citing Final Staff Report at Table C-9).

demand for HETL washers over the POI, "the domestic industry's ratio of cost of goods sold to net sales with respect to HETL washers increased." Id. at 64 (citing Final Staff Report at Table C-9).[22]  The Commission also noted that the domestic industry's COGS-to-net sales ratio for HEFL units increased.  Id. at 64 (citing Final Staff Report at Table C-2).[23]  In both cases, the Commission took into account the fact that U.S. consumption for those LRW models increased, but the domestic industry was unable to pass on the increased costs to the consumer.[24]  Thus, the Commission relied upon record evidence to support its finding of adverse price effects caused by subject imports.

Plaintiffs respond to the Commission's adverse price affects analysis by attacking the Commission's findings on lost sales.[25]  Specifically, Plaintiffs argue that "[t]he ITC's finding that 'low-priced subject import competition adversely impacted prices for the

---

[22] COGS-to-net sales ratios with respect to HETL washers increased "from [[     ]] percent in 2009 to [[     ]] percent in 2010 before declining to [[     ]] percent in 2011, a level [[     ]] percentage points higher than in 2009."  Final views at 64 (citing Final Staff Report at Table C-9).

[23] The ratio for HEFL units increased from [[       ]] in 2009, to [[        ]] in 2010, and then went back down slightly to [[        ]] in 2011.  Final Views at 64 (citing Final Staff Report at Table C-2).

[24] For instance, the Commission relied on [[



                                                                                                    ]].
Final Views at 65 (citing Whirlpool's Prehearing Brief at 59–60, Attachs. 2, 4-B, 4-C, 4-M).  See also Final Staff Report at Tables V-6, V-14 to 16.

[25] Plaintiffs do specifically attack the Commission's findings regarding underselling and price compression but do so as part of their challenge to the Commission's impact analysis.  Specifically, as will be discussed below, Plaintiffs argue that the Commission could not have found that HEFLs and HETLs were discounted to the same price as CTLs.  However, the Commission did not purport to find that the HEFLs and HETLs were the same price as CTLs, but that the prices of HEFLs and HETLs had the effect of suppressing CTL price increases.  It cited to record evidence, see Final Views at 76 (citing Final Staff Report at II-18, V-13; Hearing Transcript at 42, 118, 255–56), and considered and explained evidence that would have contradicted its finding.  Id. at 76 n.333.

domestic product' was based significantly on 'the number and magnitude of confirmed lost sales and revenue allegations made by Whirlpool.'" Joint Br. Pls. 39 (quoting Final Views at 66). However, Plaintiffs inaccurately characterize the Commission's adverse price effects determination as "based significantly" on a lost sales analysis. The Commission based its determination on record evidence regarding quarterly price comparisons and the COGS-to-net sales ratios. The Commission "f[ound] additional evidence that low-priced subject import competition adversely impacted prices for the domestic like product in the significant number and magnitude of confirmed lost sales and revenue allegations made by Whirlpool." Final Views at 66 (footnote omitted).

Moreover, the Commission's findings regarding lost sales are supported by substantial record evidence. The Final Views note that responding purchasers confirmed lost sales allegations.[26] Id. at 66 (citing Final Staff Report at Tables V-19 to 21). The Final Views separately discuss a lost sales analysis in connection with [[    ]] contract bids in 2011. The estimated cost of losing these bids to the domestic industry was over [[             ]] in revenue over the lives of the respective contracts. See id. at 67.

The Plaintiffs claim that this contract bid lost sales analysis is unsupported by substantial evidence. In particular, Plaintiffs challenge the accuracy of the number of lost sales. Joint Br. Pls. 40–41. Further, Plaintiffs argue that the Commission ignored evidence that suggests that the contract was awarded for reasons other than price. Id. at 41. However, [[

---

[26] Confirmed lost sales allegations totaled [[         ]]. Final Views at 66 (citations omitted).

]] and that approach is perfectly reasonable.  Final Views at 66–67 (footnotes omitted).  While the Plaintiffs argue the evidence suggests that the number of actual sales the domestic industry might have made would have been different, the Commission considered this argument and concluded that even if the number of sales had been less than estimated, the total magnitude of sales involved was quite large.  Id. at 67 n.296.  Moreover, one can always question what would have happened had things been different.  The question for the court is whether this was a reasonable approach to take.   The court finds that it bears a rationale relationship to the facts before the Commission, and was a reasonable approach to take.

Further the Commission did not ignore evidence regarding the motives for awarding the contracts.  It noted and weighed all the evidence.[27]   The Commission considered and discounted evidence showing that lost sales were attributable to factors other than price.  Id. at 66 (citing Final Staff Report at V-62, Table V-21; Emails Dated December 21, and 31, 2012 with Attachment, CD  245 (Dec. 31, 2012), ECF No. 111-10). Ultimately, it concluded that the [[    ]] contracts were lost because of price and it credited Whirlpool's estimates regarding lost revenue over the lives of the respective contracts.  Id. at 67 (footnote omitted).

---

[27] Specifically the Commission noted:   "[[

]]."
Final Views at 66 (citing Final Staff Report at Table V-62). The Plaintiffs challenge the weight the Commission afforded this evidence but the court cannot say that the Commission's determination was unreasonable and it will not reweigh the evidence.

Plaintiffs have failed to convince the court that the Commission's determination was unsubstantiated by the record evidence.  The Commission based its determination regarding price effects on specific findings of underselling, price depression, price suppression, as well as lost sales.  In light of the record evidence, this determination was reasonable.

## V.    Adverse Impact

Plaintiffs claim that the Commission's adverse impact analysis was not based on a proper reading of the statute and not supported by substantial evidence.  In particular, Plaintiffs argue the Commission incorrectly analyzed competition within the industry as well as price compression, and that it failed to consider alternate causes of injury.  Joint Br. Pls. 42, 45, 51.  The court finds that the Commission's determination with respect to adverse impact is in accordance with law and supported by substantial evidence.

Congress has set forth the criteria by which the Commission must assess the adverse impact of subject imports.  The statute provides:

(iii) Impact on affected domestic industry
In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to--
  (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
  (II) factors affecting domestic prices,
  (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
  (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
  (V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

      The Commission shall evaluate all relevant economic factors described
in this clause within the context of the business cycle and conditions of
competition that are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

      Furthermore, in assessing the adverse impact on the domestic industry, the

Commission must find that the injury to the domestic industry is "by reason of" the subject

imports.  19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1).  However, the subject imports "need not

be the sole or principal cause of injury" so long as they are not merely a tangential, or

incidental, cause.  Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed.

Cir. 2003).  See also Mittal Steel, 542 F.3d at 876–77.

      The Commission's determination of adverse impact was in accordance with law

and supported by substantial evidence.  The Commission applied the statutory criteria.

In doing so, it relied upon record evidence and gave reasonable explanations of its

findings and for any evidence that detracted from its findings.  The Commission found,

based upon record evidence, that while domestic capacity increased, capacity utilization

and production declined during the POI.  Final Views at 68–69 (footnotes omitted) (citing

Final Staff Report at III-2, III-3, Table C-6).  Further, employment was lower in 2011 than

in 2009, despite a brief increase in 2010.  Id. at 69 (citing Final Staff Report at III-14, Table

C-6).  The domestic industry's U.S. shipments declined somewhat during the POI, and

even though overall consumption decreased slightly in 2011, the domestic industry lost

market share to the subject imports.  Id. at 70.  Domestic industry end of year inventory

was up in 2010 from 2009 and then decreased slightly in 2011, but remained higher than

levels in 2009.  Id. (citing Final Staff Report at C-6).  Operating losses increased between

2009 and 2011. Id. (citing Final Staff Report at Table C-6). The one measure where the domestic industry showed increased growth was its capital and research and development expenditures which "remained substantial during the 2009-11 period." Id. at 71 (citing Staff Report at Table C-6; VI-5). The Commission attributed this to Whirlpool's decision to repatriate HEFL washer production from Germany and Mexico and GE's investment in a new U.S. facility. Id. at 71–72 (citing Final Staff Report at III-2, III-3; VI-12, VI-15).

Given these measures of the domestic industry, the Commission considered whether there was a causal nexus between the subject imports and the health of the domestic industry. The Commission found such a causal connection as a result of: absolute and relative increases in subject import volume; significant underselling; low priced subject imports which resulted in significantly depressed and suppressed domestic like product prices; as well as, a significant volume and value of lost sales. The Commission's impact analysis was reasonable in light of the record, including any evidence which would have detracted from its finding.

Plaintiffs nonetheless press four arguments they made before the Commission. First, Plaintiffs contend that since a large portion of the domestic industry was made up of top-loading models less than 3.7 cubic feet in capacity and there were virtually no subject imports of top-loading models in this capacity, subject imports of the larger HETL and HEFL models could not have caused injury to the domestic industry.[28] Joint Br. Pls.

---

[28] In 2011, [[      ]] of the domestic industry's top-loading U.S. shipments were made up of top-loading models less than 3.7 cubic feet in capacity. See Final Staff Report at Tables C-3 to 5.

45.  Plaintiffs contend that the Commission ignored the argument that any harm to the domestic industry arose not from subject imports, but instead from domestically produced smaller HETL models.  Id. at 44–45.

The  Commission  properly  considered  and  rejected  this  argument.    The Commission addressed record evidence indicating that the subject imports did not directly compete with domestic CTLs, the near majority of the domestically produced washer type. Final Views at 73 (footnote omitted).[29]  The Commission obtained trade and financial data for all washers, including CTL and HETL models less than 3.7 cubic feet in capacity, testimonial  evidence  regarding  the  effect  of  prices  of  subject  merchandise  on  the domestic like product, data concerning the ratio of COGS-to-net sales for CTL washers, and pricing information for HETL washers with a capacity under 3.7 cubic feet.  See supra Section  II.    Moreover,  the  Commission  acknowledged  that  during  the  period  of investigation, consumer preferences shifted from smaller CTLs to HETLs and HEFLs.  Id. at 73–74.  The decreasing demand for CTLs led the domestic industry to shift "away from the CTL washer segment . . . ."  Id.  As a result, a greater volume of domestic washers competed directly with subject imports of large HETLs and HEFLs.  The subject imports captured  more  of  the  HE  market  share  and  prevented  the  domestic  industry  from improving its condition through increased sales of the HE models.  Id. at 54 and 74

---

[29] "The proportion of the domestic industry's U.S. shipments that competed directly with subject imports increased significantly between 2009 and 2011 as CTL washers declined as a share of the industry's U.S. shipments from [[      ]] percent in 2009 to [[      ]] percent in 2011."  Final Views at 73 (footnote omitted).

(footnotes omitted).   <u>See also</u> Final Staff Report at Tables C-2, C-3.[30]   Thus, the

Commission specifically addressed this argument as it found the subject imports of larger

HETL and HEFL washers were responsible for the domestic industry's declining sales of

CTL washers.  Final Views at 73–75.

Second, Plaintiffs argue the Commission cannot rely upon its price compression

theory to support its impact analysis.  Plaintiffs reject the Commission's conclusion that

subject imports of large HETL and HEFLs affected the prices of CTLs because it was

premised on the finding that subject import prices were the same as CTL prices, an

inference not supported by the evidence collected and contradicted by record AUV data.

Joint Br. Pls. 46–48.   Plaintiffs argue that because the Commission did not collect

quarterly price data on CTLs, the Commission lacked evidentiary support for its price

compression theory.   <u>Id.</u> at 46.   Further, the Plaintiffs cite AUV data Respondents

submitted during the investigation that shows CTLs were far less expensive than HEFLs

and HETLs.   <u>See id.</u> at 47 (citing LG's Prehearing Brief at 82–83, CD 206 (Dec. 4, 2012),

---

[30] The domestic industry's overall performance was suffering during the POI.  Domestic industry profits for the entire HETL segment declined from [[      ]] in 2009 to [[      ]] in 2010 and [[      ]] in 2011.  Final Views at 74 (citing Final Staff Report at Table C-9).  The domestic industry's operating losses as a share of net sales in the HEFL segment increased from [[      ]] in 2009, to [[      ]] in 2010, and then recovered slightly in 2011 to [[      ]], but not enough to reach pre-2009 levels.  <u>Id.</u> at 74 (citing Final Staff Report at Table C-2).  In addition, three U.S. plants closed, and even though capital and R&D expenses increased, the industry's sunk costs in those investments did not result in the expected profits as a result of the subject import competition.  <u>Id.</u> at 68, 71, 74 (footnotes omitted).  Furthermore, the Commission found that the increase in subject imports of more affordable, but larger and more fully featured, HETL and HEFL models reduced demand for CTL models as well as prevented the domestic industry from raising its CTL prices.  <u>Id.</u> at 76 (citing Final Staff Report at II-18, V-13, Table C-4; Hearing Transcript at 42, 118, 255–56).

ECF No. 111-6–7 (July 1, 2014)).  <u>See also</u> Final Staff Report at Tables C-3, C-4).  In

fact, Plaintiffs misstate the Commission's findings.  Plaintiffs claim that "the ITC's 'price

compression' theory was based on the assumption that subject imports were 'discounted

to the same price' as domestic CTL washers."   Joint Br. Pls. 48.   However, the

Commission did not find that HEFLs and HETLs were the same price as the CTLs.  It

found that the higher priced, but more fully featured HEFLs and HETLs nevertheless

suppressed and depressed CTL sales and prices.  Final Views at 76 & n.333 (citations

omitted).  The Commission also stated that it declined to use AUV data in its pricing

analysis because "the[is] data [is] influenced significantly by changes in product mix, even

within washer segments."  <u>Id.</u> at 60 n.268 (citations omitted).  It cited to record evidence,

<u>see id.</u> at 76 (citing Staff Report at II-18, V-13; Hearing Transcript at 42, 118, 255–56),

and considered and explained evidence that would have contradicted its finding.  <u>Id.</u> at

60 n.268, 76 n.333.

Third, Plaintiffs argue that the Commission's finding that higher priced imports

affected the prices of less expensive domestic products is contrary to its traditional

practice and illogical.  Joint Br. Pls. 49.  Plaintiffs argue that any conclusion that higher

priced imports could suppress or depress the prices of lower priced domestic products

would vitiate the Commission's underselling analysis. <u>Id.</u> at 49–50.  In making its adverse

price effect inquiry, the statute specifically directs the Commission to separately consider

underselling    as    well    as    price    depression    and    suppression.    19    U.S.C.

§ 1677(7)(C)(ii).   Contrary to the Plaintiffs' argument, it is perfectly logical that price

depression and suppression could be the result of adverse effects from subject imports

even though they did not undersell the domestic like product.  Otherwise, there would have been no reason for Congress to direct the Commission to consider the two categories separately. In light of these separate lines of inquiry, the Commission considered Respondents' arguments that higher priced models could not depress or suppress the prices of lower priced models and specifically found that "more fully featured washers do not have to be priced lower than smaller, less fully featured washer models to adversely affect the sales and prices of smaller, less fully featured washer models." Final Views at 76 n.333.

Plaintiffs further argued both below and in their briefs that contrary to the Commission's position that subject import prices compressed the domestic industry's CTL prices, "the reverse is much more likely to be true: the domestic producer would reduce the prices of its cheaper models, which would in turn 'squeeze' the importer's prices of more expensive models."  Joint Br. Pls. 50.  However, as the Commission explained, because of the domestic industry's increasing COGS-to-net sales ratio, it had every incentive to try and raise prices to cover its costs, but no reason, other than competition with the subject imports, to keep CTL prices low.  See Final Views at 76 n.333 (citing to Final Staff Report at Table C-4).  The Commission relied upon record evidence that it weighed, and acknowledged the evidence that might have detracted from its conclusion. See id. at 75–76.

Finally, Plaintiffs argue that the Commission's impact analysis concerning the volume of subject imports is not supported by substantial evidence.  Plaintiffs argue that Electrolux's relocation undermines the critical finding that subject imports took market

share away from the domestic industry.  Plaintiffs contend Electrolux's exit caused the

decline in U.S. production and market share, and that its exit was not due to subject import

competition.  Joint Br. Pls. 53.  Defendant correctly points out that once the Commission

reasonably found that Electrolux was part of the domestic industry, its data had to be

included in the state of the industry analysis.   19 U.S.C. § 1677(7)(C)(iii).[31]  See, e.g.,

Altx, Inc. v. United States, 25 CIT 1100, 1114–15 167 F. Supp. 2d 1353, 1370-71 (2001).

Nonetheless, Plaintiffs here do more than merely recast their argument about the relevant

domestic industry.  Even assuming that Electrolux's data must be included in the domestic

industry data, the Plaintiffs are making a more nuanced argument about causation.

Plaintiffs are challenging the Commission's finding that the industry was harmed "by

reason of" the imports.  Plaintiffs are proposing an alternative source of the industry's

harm, namely Electrolux's departure, which Plaintiffs claim is unrelated to imports.

The Commission acknowledged that Electrolux "reports that it decided to close its

U.S. production facility in 2008 for reasons other than subject import competition" but still

found that domestic industry's loss of market share, even though sustained by Electrolux,

had an adverse impact on the domestic industry.  Final Views at 53 n.245.  Although the

Commission must not attribute to subject imports an injury whose cause lies elsewhere,

the court will affirm the Commission's determination where it considered the alternate

cause of harm and reasonably explained its determination.  Here, the Commission

considered the argument that the increase in volume was not significant because of

---

[31] The statute requires the Commission to evaluate the impact of all relevant economic
factors "on the state of the industry . . . ."  19 U.S.C. § 1677(7)(C)(iii).

Electrolux's departure from the domestic industry, but found that Electrolux was not shielded from competition and thus its loss did not render the industry's loss less significant. Id. at 53 n.245.

More importantly, the Commission did not base its causation analysis merely on the loss in market share attributable to Electrolux's relocation, but upon a host of other factors.   The Commission also found that the "[s]ubject import volume increased significantly in absolute terms. . . ." Id. at 72.  The Commission relied on: the fact that two other domestic producers closed their U.S. production facilities, with at least one closing due to the subject imports' impact on the domestic industry, id. at 68 (citing Final Staff Report at III-1 n.1, III-2); the decrease in the domestic industry's capacity utilization, id. (citing Final Staff Report at Table C-6); the decrease in domestic industry employment, id. at 69 (citing Final Staff Report at III-14, Table C-6); the industry's overall increase in end-of-period inventory with 2011 levels still [[         ]] higher than 2009 levels, id. at 70 (citing Final Staff Report at Table C-6); and the industry's increased COGS, which outpaced net sales over the period of investigation.  Id. at 70–71 (footnotes omitted). Although capital and research and development expenses increased, the domestic industry was unable to recoup its financial investments.  Id. at 71 (footnotes omitted). The Commission has demonstrated by substantial record evidence "the harm occurred by reason of" the subject imports and "not by reason of a minimal or tangential contribution to material harm caused by LTFV goods." Mittal Steel, 542 F.3d at 874 (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 722 (Fed.Cir.1997)) (internal quotation marks omitted). See also 19 U.S.C. §§ 1671d(b)(1), 1673d(b).

**Conclusion**

For the reasons provided above, the court denies Plaintiffs' motion for judgment on the agency record and sustains the Commission's affirmative determination.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated:November 6, 2014
New York, New York